**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

**Civil Action No. 13-cv-02939-MSK-NYW**

**DEEPIKA ALURU, M.D.,**

**Plaintiff,**

**v.**

**ANESTHESIA CONSULTANTS, PROFESSIONAL CORPORATION; and**
**PAUL A. GUTOWSKI, D.O.,**

**Defendants.**

---

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

This matter comes before the Court on Defendants' Motion for Summary Judgment **(#66)**, Plaintiff's Response **(#70)**, and the Defendants' Reply **(#76)**.

## I. JURISDICTION

Plaintiff, Deepika Aluru, (Dr. Aluru), asserts claims under federal law, thus, the Court has jurisdiction over her federal claims and exercises supplemental jurisdiction over her related state law claims. *See* 28 U.S.C. §§ 1331, 1343(a). Because Dr. Aluru's claims involve employment discrimination, she was required to, and did, file a charge with the Colorado Civil Rights Division (CCRD) and the Equal Employment Opportunity Commission (EEOC), which issued her a Right to Sue Letter.

## II. BACKGROUND

The following facts are undisputed, or, if disputed, set forth in the light most favorable to the Plaintiff.

Dr. Aluru is, among other things, a female, 47 years old (as of the time of the pertinent events), of East Indian descent, a practicing Hindu, and a licensed anesthesiologist. She brings this suit against her former employer and a supervisor, Defendants Anesthesia Consultants, Professional Corporation (Consultants) and Paul Gutowski (Dr. Gutowski), alleging claims for employment discrimination based on religion, race, gender, and age, as well as various other claims related to conditions of her employment and ultimate termination from Consultants. Consultants is a practice group consisting of several anesthesiologists and nurses that contracts with local hospitals and surgery centers to provide anesthesia services.

**A. Dr. Aluru's Employment With Consultants**

Dr. Aluru began working for Consultants in 2001. From 2001 through 2005 she received good reviews, raises, and benefits.

Sometime in late 2005 or 2006, Dr. Paul Gutowski unofficially became Consultants' Clinical Director. As Clinical Director, Dr. Gutowski prepared schedules for Consultants' anesthesiologists, and approved or denied vacation requests. Dr. Gutowski acted as Dr. Aluru's supervisor, but she ultimately reported to Dr. Elliott Wohlner, Consultants' President.

Dr. Wohlner and Dr. Gutowski testified that around 2006, they began receiving complaints from surgeons (and one hospital administrator) regarding Dr. Aluru's abilities and timeliness. They could recall at least six surgeons who complained, Dr. Wohlner believed there could have been even more, and the Defendants produced affidavits prepared by three of them. Dr. Wohlner believed that, in some cases, Dr. Aluru was failing to demonstrate adequate clinical

skills which caused problems operations.[1] Dr. Gutowski's concern was, among other things, Dr. Aluru's ability to simultaneously handle and manage several cases.

There is a dispute, albeit a somewhat vague one, as to whether and to what extent Dr. Wohlner and Dr. Gutowski conveyed to Dr. Aluru their dissatisfaction with her performance. Dr. Aluru insists that "to the extent that any surgeons or other employees had concerns about [her] or her work, those concerns were never at any time communicated to [her]." Dr. Wohlner does not expressly state whether he directly confronted Dr. Aluru about her performance problems; he testified that "I discussed it with her," although it is not entirely clear as to what the "it" in that sentence refers. (From the context of the questioning, Dr. Wohlner may be referring to discussing "performance deficiencies" or his encouragement to Dr. Aluru that she "improve her skills.") It appears that Dr. Wohlner primarily addressed his concerns with Dr. Aluru more passively and indirectly, by intervening to ensure that she was assigned to less-complex cases, and by encouraging her to speak with other experienced anesthesiologists and to seek out additional training. (Dr. Gutowski admittedly did not discuss his concerns about Dr. Aluru's performance with her.) Notwithstanding Dr. Wohlner's efforts, from 2008 to 2012, Dr. Wohlner believed that Dr. Aluru's proficiency continued to deteriorate, although it is undisputed that Consultants gave her a raise Dr. Aluru in 2008.

**B. Dr. Aluru's Termination**

At some point in 2012, Consultants lost a major hospital contract, resulting in lost revenues and a need to reduce the number of its physicians. Dr. Wohlner considered Consultants' staffing needs, employees' job performance (including surgeon complaints), among

---

[1] Indeed, an affidavit from one surgeon described a circumstance in which Dr. Aluru lost a patient's airway, and despite what the surgeon described as a life or death situation, Dr. Aluru took her time re-securing the patient's air.

other factors, and decided to terminate Dr. Aluru and two male anesthesiologists. Dr. Wohlner selected Dr. Aluru for termination based, in part, on an assessment that Consultants' practice had become more complex, with more difficult procedures being performed, resulting in less cases he believed Dr. Aluru was capable of handing. Dr. Wohlner notified Dr. Aluru of her termination on or about July 9, 2012, and her last day of work was August 8, 2012.

Dr. Aluru points out that Consultants had only recently[2] hired two new anesthesiologists, both white males under age 40, suggesting either that the new employees rebut Consultants' claim of financial difficulties or that these newest employees were the most logical candidates for economically-motivated layoffs. The Defendants explain that the new anesthesiologists' skills and training were superior to those of Dr. Aluru, in at least one important respect: the performance of nerve blocks using ultrasound. (Dr. Aluru responds that she had "substantial experience performing . . . nerve blocks," and that she did so "repeatedly and frequently" during her employment at Consultants. In reply, the Defendants try to make clear that they are not suggesting that Dr. Aluru was "terminated for lacking skills in ultrasound nerve blocks,"[3] but merely explaining that she "lacked the extensive residency training that [the new anesthesiologists] underwent" in that procedure.)

**C. Allegations of Discrimination**

Dr. Aluru filed a charge of discrimination with the Colorado Civil Rights Division in November 2012. She subsequently received a right-to-sue letter and filed suit against

---

[2] Dr. Aluru asserts that the new doctors were hired "in the period immediately during and following the termination of my employment." Dr. Gutowski testified that the two began work in July 2012, but that they were interviewed by Consultants and offered the job at least nine months before they actually began work, and that those offers were extended before Consultants learned of the loss of the hospital contract. Dr. Aluru does not appear to dispute Dr. Gutowski's timeline.

[3] Arguably, Dr. Wohlner may have questioned Dr. Aluru's skills in performing nerve blocks. He states that "One of the issues with Dr. Aluru was her ability to do nerve blocks."

Consultants in October of 2013. She asserts nineteen claims for relief.[4] Consultants moves for summary judgment on each of her claims.

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a Motion for Summary Judgment or a Motion for Partial Summary Judgment is whether a trial is required.

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it relates to an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

---

[4] Specifically, Dr. Aluru's Complaint raises the following:

- Claims 1-3, 6, 8-10: discrimination based on race, religion, and gender in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.* 42 U.S.C. § 1983, and the Colorado Anti-Discrimination Act, ), Colo. Rev. Stat. §§ 24-34-401, *et seq.* ("CADA"), respectively;
- Claims 4 and 11: age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA") and CADA, respectively;
- Claims 5 and 7: unlawful retaliation in violation of Title VII and § 1981, respectively;
- Claim 12: breach of employment contract;
- Claims 13 and 14: aiding and abetting in violation of, or obstructing in compliance with CADA against Dr. Gutowski;
- Claims 16 and 17: intentional interference with employment contract and intentional interference with business opportunity against Dr. Gutowski;
- Claim 18: intentional infliction of emotional distress against Dr. Gutowski; and
- Claim 19: wrongful termination in violation of public policy.

For purposes of considering a summary judgment motion, substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). On summary judgment, the Court views the evidence presented in the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

As is the case here, a different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 850 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, then a trial is required. Conversely, if the

respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary may enter. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## IV. DISCUSSION

### A. Claims 1-4, 6, and 8-11: Discrimination based on Race, Religion, and National Origin, and Age

Dr. Aluru raises several claims contending that Consultants discriminated against her based on race, religion, gender, and age: Claims 1-3 allege racial, religious, and gender discrimination under Title VII, 42 U.S.C. §§ 2000e, *et seq.*; Claim 6 asserts racial discrimination under 42 U.S.C. § 1981; Claims 8-10 assert racial, religious, and gender discrimination in violation of the Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. § 24-34-401, *et seq.*; and Claims 4 and 11 assert age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (ADEA), and CADA, respectively. Consultants argues that summary judgment should enter in its favor on each of these claims.

#### 1. Legal Standards

On summary judgment, Title VII employment discrimination claims are analyzed under the following burden-shifting framework enumerated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A § 1981 claim for employment discrimination based on race involves the same analysis as those brought under Title VII. *Carney v. City & Cnty of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008); *Baca v. Sklar*, 398 F.3d 1210, 1218 at n. 3 (10th Cir. 2005). Likewise, claims alleged under the Colorado counterpart to Title VII, CADA, are also analyzed using the Title VII framework. *See Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1253-54 (Colo. 2001); *Williams v. Dep't of Public Safety*, ___ P.3d ___, ___, 2015 WL 9584012, at *7 (Colo. App. 2015). So are claims brought under the ADEA. *See Hinds v. Sprint/United Mgmt. Co.*. 523 F.3d

1187, 1195 (10th Cir. 2008). Thus, the Court analyzes all of these claims, collectively (hereafter "the disparate treatment claims"), according to the principles set forth below.

First, the plaintiff bears the burden to set forth a *prima facie* case for discrimination. *See Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1353-54 (2015); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). Dr. Aluru must show that: 1) she belongs to a protected class; 2) she suffered an adverse employment action; and 3) the adverse action occurred under circumstances giving rise to an inference of discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). If Dr. Aluru establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Bennett,* 792 F.3d at 1266. The burden then returns to Dr. Aluru to demonstrate pretext – that is, to show that the employer's proffered reason is untrue and that prohibited discrimination is the true reason for the adverse action. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010).

2. The *Prima Facie* case

It is undisputed that Dr. Aluru is a member of several protected classes as a: female (sex), person of Indian descent (race and/or national origin), Hindu (religion), and person over the age of 40 (age). Thus, she satisfies the first element of the *prima facie* case as to all of the disparate treatment claims.

(a) Adverse action

The first major point of dispute between the parties as to the disparate treatment claims concerns which alleged adverse employment actions might support those claims. It is undisputed that Dr. Aluru suffered an adverse employment action when she was terminated, and her disparate treatment claims relating to that termination clearly may proceed. However, Dr. Aluru

argues that she was subject to additional adverse employment actions prior to her termination that are themselves actionable, broadening those claims. She asserts that she: 1) was denied vacation requests; and 2) received less favorable work scheduling (namely, was not scheduled for weekend calls). The Court briefly examines each of these contentions in more detail.

With regard to the allegations concerning vacation requests, Dr. Aluru relies entirely on a single, two-sentence paragraph in her affidavit. That paragraph recites a single incident in October 2007, in which she "was informed that my request for three weeks of uninterrupted vacation time (so that I could visit my family in India) had been denied." She notes that "male Caucasian anesthesiologists under the age of 40 were granted three weeks of block vacation time." Beyond these statements, she does not elaborate as to who denied the vacation request, identify the individuals who received more favorable treatment than she did, or otherwise provide any meaningful details.

The denial of Dr. Aluru's vacation request in October 2007 fails to amount to an adverse employment action sufficient to support a claim for numerous reasons. Although the denial is a discrete, identifiable act, Dr. Aluru did not mention it in her charge of discrimination with the Colorado Civil Rights Division (CCRD). As such, she failed to exhaust her administrative remedies with regard to this issue.[5] *See Natl. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Even if her charge <u>had</u> mentioned the vacation issue, her charge was filed in November 2012, more than 5 years after the denial and long past the 300-day deadline set by 42 U.S.C. § 2000e-5(e)(1).[6] *See Brown v. Lowe's Home Centers*, 627 Fed.Appx. 720, 725 (10th Cir. 2015).

---

[5] The administrative exhaustion requirements provided by Title VII apply with equal force to claims under CADA, *see generally* C.R.S. § 24-34-306(14), and claims under the ADEA, 29 U.S.C. § 626(d)(1)(A).

[6] Although Dr. Aluru's § 1981 claim, premised on race discrimination, is not subject to administrative exhaustion requirements, claims under that statute are subject to a four-year

Third, the Court finds that a single denial of a request for vacation time does not constitute an adverse employment action in any event. Such actions are those that cause a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision that causes a significant change in benefits. *Stinnett v. Safeway, Inc.*, 337 F.3d 1214, 1217 (10th Cir. 2003). Minor employment actions which make an employee unhappy are not sufficiently adverse as to form grounds for a discrimination suit. *MacKenzie v. City & Cnty of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005). Accordingly, the denial of Dr. Aluru's October 2007 vacation request does not constitute an adverse employment action capable of supporting her disparate treatment claims.

The Court then turns to Dr. Aluru's contention that she received less-favorable work assignments and scheduling than others outside of her protected class. Dr. Aluru points to two factual sources with regard to this assertion: two paragraphs in her own affidavit, and an exhibit consisting of approximately 75 pages of "scheduling calendars," for which no further explanation, interpretation, or pinpoint citation are provided. The Court summarily refuses to wade through the calendars on its own in search of evidence that might be favorable to Dr. Aluru. *See generally Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). Thus, it limits its consideration to Dr. Aluru's affidavit. She states that "under [Dr.] Gutowski's direction, male Caucasian anesthesiologists received more favorable work location assignments," and that Dr. Gutowski "did not schedule me for 'weekend call,'" but did so for white male employees under age 40. She states that she was qualified for "weekend call" assignments and that she had performed them prior to Dr. Gutowski's arrival. Dr. Aluru does not otherwise

statute of limitation. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Because Dr. Aluru did not commence this action until October 2013, some six years after the October 2007 vacation request denial, any § 1981 claim premised on that denial would be untimely as well.

elaborate on how "weekend call" assignments differ from other shifts or explain how a failure to receive such assignments would affect the terms and conditions of her employment.

Dr. Aluru's CCRD charge contains a vague reference to the fact that "male Caucasian anesthesiologists received more favorable call schedules," and, arguably, this might be enough to exhaust a claim of sex and/or race discrimination in work scheduling, at least with regard to instances of discriminatory scheduling occurring within the 300 days immediately preceding the filing of her charge on November 27, 2012 (that is, discriminatory scheduling occurring between approximately February 1, 2012 and Dr. Aluru's termination in July 2012). But the question remains whether Dr. Aluru has come forward with sufficient evidence to demonstrate that not receiving "weekend call" assignments is a modification of job assignments so significant as to constitute an adverse employment action. Generally, without more, scheduling disputes rarely qualify as adverse employment action. *See Arnold v. City of Denver*, No. 14-cv-00290-REB-CBS, 2015 WL 333056, *8 (D. Colo. Jan. 23, 2015) (*citing Brown v. Georgetown Univ. Hospital Medstar Health*, 828 F.Supp.2d 1, 8 (D. D.C. 2011). For example, the Tenth Circuit concluded that directing a truck driver to deliver loads which required him to cross a city during rush-hour traffic was "a mere inconvenience," not actionable adverse action. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011).

Dr. Aluru argues, without specificity, that weekend call is preferable. There is some evidence from which the Court can conclude that weekends are busier with more emergency cases, which requires anesthesiologists working during the weekend to handle more cases at once and quickly turnover clients. For example, Dr. Mains, the head of trauma surgery, stated in his declaration that, on weekends, St. Anthony Hospital receives a high volume of complex and life-threatening cases because it is a Level I Trauma Center, and any anesthesiologist working a

weekend must be able to manage a high volume of complex, critical cases. However, there is no evidence that an anesthesiologist working weekends has a different job title or status, is more likely to advance in her career, or receives any additional benefits. Therefore, even taking the evidence in the light most favorable to Dr. Aluru, there is nothing from which the Court can conclude that excluding Dr. Aluru from weekend scheduling amounted to anything more than a failure to cater to Dr. Aluru's preferences. Accordingly, the Court finds that Dr. Aluru has not come forward with evidence that would suggest that a denial of "weekend call" assignments constitutes an adverse employment action that would support a disparate treatment claim.

Dr. Aluru therefore has established that she was subjected to a single adverse employment action – her July 2012 termination. The Court will consider the remainder of her disparate treatment claims only with regard to that termination.

(b) <u>Circumstances giving rise to an inference of discrimination</u>

Consultants primarily disputes Dr. Aluru's ability to prove the third element of her *prima facie* case, arguing that she cannot offer evidence that termination occurred under circumstances giving rise to an inference of discrimination. An employee's burden at this stage is not an onerous one and an employee might demonstrate this element in a variety of ways, by showing that: another employee, not of the protected class, was treated more favorably or not subjected to the adverse action, *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 200 F.3d 1184, 1192 (10th Cir. 2000); *Notari v. Denver Water Dep't*, 971 F.2d 585, 588 (10th Cir. 1992); *see Bennett*, 792 F.3d at 1267; an employer made discriminatory comments or remarks, s*ee Ramsey v. City & Cnty of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990); *see also Chytka v. Wright Tree Servs., Inc.*, 925 F.Supp.2d 1147, 1162-63 (D. Colo. 2013); or, following the employee's termination, the employee was replaced with someone outside the protected class, *see e.g. Perry v. Woodward*,

199 F.3d 1126, 1140 (10th Cir. 1999); *Butler v. City of Prairie Village*, 172 F.3d 736, 748 (10th Cir. 1999).

Here, Dr. Aluru satisfies this element by showing that at approximately the same time that it was terminating her Consultants was hiring new employees to perform the very same tasks. These new employees were white males under the age of 40 and, by all appearances, non-Hindu. Thus, given the minimal burden that she bears at this stage, Dr. Aluru demonstrates circumstances giving rise to an inference of discrimination by showing that she was replaced by persons outside of her protected classes.

The Court pauses at this point in its analysis to address additional allegations Dr. Aluru offers as evidence of discrimination. She contends that Dr. Gutowski made certain offensive and prejudicial comments about her to a third party. She offers the testimony of Dr. Richard Martin, a co-worker, who stated that on one occasion, he heard Dr. Gutowski refer to Dr. Aluru as a "Hindu bitch," and, on another, a "bitch."[7] Dr. Martin believes these comments occurred "in the mid two thousands," and that the "Hindu bitch" comment might have related to Dr. Gutowski stating that "he despised being obliged to provide vacation time" (which would seem to place the remark near October 2007). She also states that Dr. Gutowski informed Dr. Aluru that Consultants "do[es]n't need people of [her] kind." Although such offensive comments by Dr. Gutowski might be relevant if Ms. Aluru was asserting colorable disparate treatment claims in which Dr. Gutowski was the decision-maker, she is not. Her claims are limited to challenging her termination, and in that regard, the record is clear that Dr. Wohlner, not Dr. Gutowski, was

---

7 Dr. Martin went on to testify that comments "were frequent" and "so seemingly commonplace that specificity gets lost," but it is not entirely clear that he is specifically referring to any other occasions in which Dr. Gutowski called Dr. Aluru a "Hindu" or "bitch." The context of this testimony by Dr. Martin seems to be that Dr. Gutowski was brusque or demeaning to Dr. Aluru as a general matter – that "any time he would refer to Dr. Aluru, it wasn't – it didn't seem as if it was with any collegial kindness, fondness or respect."

the person who decided to terminate Dr. Aluru's employment. Dr. Aluru points to no evidence indicating that Dr. Wohlner ever referred to her in similarly disparaging terms, that Dr. Wohlner was aware of Dr. Gutowksi's prejudicial statements about Dr. Aluru and acquiesced in them, or that Dr. Wohlner relied uncritically upon any opinion that Dr. Gutowski may have had regarding who should be terminated. Thus, although the record might permit the conclusion that Dr. Gutowski harbored prejudice against Dr. Aluru on one or more grounds, that prejudice is irrelevant to the disparate treatment claims that are before the Court.

3. Consultants' Nondiscriminatory Reason and Pretext

To refute Dr. Aluru's *prima facie* showing, Consultants need only articulate some legitimate, non-discriminatory reason for her termination. *See Furnco Const. Corp. v. Waters*, 438 U.S. 567, 578 (1978); *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992). Consultants explains that a financial reversal caused it to have to lay off some physicians, and that Dr. Wohlner chose Dr. Aluru to be one of those laid off because her performance was unsatisfactory (at least as compared to those physicians who were retained). Thus, the Court turns to whether Dr. Aluru can show that reason to be a pretext for discrimination. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007); *see also Reeves*, 530 U.S. at 143 (the employee bears the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee).

To show pretext, a plaintiff must provide evidence suggesting the defendant's explanation is false or insincere. *See Mickelson*, 460 F.3d at 1315; *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005). For example, a plaintiff might point out weaknesses, inconsistencies, or contractions in the proffered explanation; show that non-minority employees in the same situation were treated more favorably; or point to evidence suggesting that the

decision-maker harbored unlawful bias. *See Swackhammer*, 493 F.3d at 1167; *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). If the Plaintiff comes forward with evidence sufficient to raise a genuine dispute of material fact as to the truth of the employer's proffered reason, this may also be sufficient to suggest that discrimination was the true reason. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1312 (10th Cir. 2005); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 516-18 (1993).

However, when the employer's proffered non-discriminatory reason involves issues of employee performance, the Court exercises some reluctance. Courts do not sit as "super-personnel departments," assessing whether an employer's evaluation of the relative merits of different employees is wise, fair, or even necessarily correct. *Dalpiaz v. Carbon Cnty, Utah,* 760 F.3d 1126, 1133 (10th Cir. 2014); *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1200 (10th Cir. 2015). The Court examines the facts as they appeared to the employer – specifically, as they appear to the individual who made the decision to terminate or take action against the plaintiff – and the inquiry is whether the employer's subjective beliefs match the proffered reason. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). The fact that the employee might disagree with the employer or believe that her own performance was adequate is not sufficient to raise a genuine dispute of fact as to the employer's subjective assessments. *Furr v. Seagate Tech., Inc.*, 83 F.3d 980, 988 (10th Cir. 1996).

Dr. Aluru attacks Consultants' claim that loss of the hospital contract caused financial difficulties that mandated layoffs. She notes that, at the same time it terminated her, Consultants hired two new anesthesiologists and granted pay raises to other physicians. She also notes that Consultants hired several additional anesthesiologists in the ensuing 18 months. This evidence is not sufficient to raise a genuine dispute of fact as to Consultants' proffered explanation for Dr.

Aluru's termination. Although the new anesthesiologists began working close in time to Dr. Aluru's termination, Dr. Aluru has noevidence to dispute Consultants' contention that it actually <u>hired</u> (as in, extended an offer of employment to) those doctors nearly a year earlier, long before the loss of the hospital contract that precipitated the layoffs. And Dr. Aluru offers no evidence to refute that Consultants did indeed lose a significant contract in early 2012 or that it decided to make economically-based layoffs as a result. Although Consultants gave raises to two employees around the time that it laid off Dr. Aluru and two other anesthesiologists, there is no evidence that the two events are somehow related (*e.g.*, that withholding the raises might have alleviated the need to lay off the three physicians) or that Consultants previously relied on its financial concerns to withhold raises for other employees. Accordingly, the Court cannot say that Dr. Aluru has demonstrated a genuine dispute of fact as to whether Consultants' claim of an economic need to make layoffs is pretextual.

Moreover, Dr. Aluru has not presented facts that would call into question Dr. Wohlner's subjective belief that Dr. Aluru's performance was deficient when compared to other anesthesiologists on Consultants' staff. The record is undisputed that Dr. Wohlner received complaints from several surgeons about Dr. Aluru's performance, that he had his own concerns about her abilities, and that he had felt the need to steer her towards a dwindling number of less-complex cases. Although Dr. Aluru asserts that Dr. Wohlner never informed her of his concerns, that fact is insufficient to create a genuine dispute as to the truth of Dr. Wohlner's assertions. It may be bad personnel practice for an employer to silently harbor doubts about an employee's performance, rather than to inform the employee about those concerns, but once again, the Court does not sit in judgment on whether Dr. Wohlner or Consultants' business management decisions were appropriate. Dr. Aluru also argues, at some length, that it would be unreasonable for

Consultants to have harbored doubts about her abilities and yet not taken precautionary actions, such as terminating her earlier or reporting her to state licensing boards. Such an argument reflects a misunderstanding of Consultants' position: Consultants is not asserting that Dr. Aluru was incompetent, merely that it believed she was among the less capable members of its practice. Thus, when it came time for layoffs, she (among others) was selected for termination.

Accordingly, because Dr. Aluru has not met her burden to show Consultants' explanation that she was terminated based on her performance was pretext for discrimination. Summary judgment is therefore appropriate in favor of Consultants on Dr. Aluru's Claims 1-4, 6, and 8-11.

**B. Claims 5 and 7: Retaliation**

Dr. Aluru contends that Consultants retaliated against her after she complained to Dr. Wohlner about Dr. Gutowski's behavior in or about mid-2008. Consultants moves for summary judgment on Dr. Aluru's fifth claim and seventh claims for relief, which allege retaliation under Title VII and 42 U.S.C. § 1981.

1. Retaliation Under Title VII

Consultants contends that Dr. Aluru's Title VII retaliation claim must be dismissed because she failed to exhaust her administrative remedies as to this claim.

There is no dispute that, to bring a Title VII claim against an employer in this Court, an employee must first exhaust her administrative remedies. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007). Exhaustion requires that an employee include allegations of retaliation in a charge of discrimination timely filed with the EEOC or CCRD. *Id.* at 1186. "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." *Id.*; *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260

(10th Cir. 1998). Such a presumption may be rebutted only if the narrative of the charge clearly sets forth the basis of the claim. *Jones*, 502 F.3d at 1186.

In her CCRD charge (which Dr. Aluru completed with the assistance of counsel), she checked off several boxes indicating her specific claims. Namely, she indicated a belief that she had been discriminated against on the basis of religion, race, and gender; she did not, however, check the box indicating she was asserting a retaliation claim. Likewise, in her CCRD charge, she responded "No," to the question, ". . . were you retaliated against by the Respondent…?" Moreover, there are no facts stated in the narrative portion of her charge which would otherwise alert the agency to the fact that she was raising a retaliation claim.[8]

Accordingly, the Court finds that entry of summary judgment in Consultants' favor is appropriate as to Dr. Aluru's Title VII retaliation claim.

2. <u>42 U.S.C. § 1981</u>

Retaliation claims brought under § 1981 do not require a plaintiff exhaust her administrative remedies. *Felix v. City & Cnty of Denver*, 729 F .Supp.2d 1243, 1254 (D. Colo. 2010) (*citing CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-50 (2008)); *see Manning v. Blue Cross & Blue Shield of Kansas City*, 522 Fed. App'x 438, 440 (10th Cir. April 12, 2013) (dismissing plaintiff's Title VII retaliation claim for failure to exhaust but permitting the § 1981 claim to proceed to the merits).

---

[8] Dr. Aluru's CCRD charge mentions that "in June of 2008, I did complain to Dr. Wohlner about Dr. Gutowski and his treatment of me." She alleges that, despite Dr. Wohlner's assurances that "the discrimination I was experiencing would come to a halt," Dr. Wohlner failed to carry out that promise and "both subtle and more conspicuous backstabbing and sabotage of my work continued," but that "Dr. Wohlner was not in a position to see thins because he was not involved in the clinical aspect of the practice." These allegations do not suffice to indicate any belief by Dr. Aluru that Dr. Wohlner, the only person who apparently had knowledge of her complaint of discrimination, took any action in retaliation for that complaint.

Retaliation claims under § 1981 are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. A plaintiff must first make a *prima facie* case by showing that 1) she engaged in protected conduct by, as relevant here, complaining of unlawful discrimination; 2) that her employer took adverse action against her; and 3) there is a causal connection between the protected activity and the adverse employment action. *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). If the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a non-retaliatory reason for the adverse action, and the employee bears the burden of proving that the proffered reason is a pretext for retaliation.

(a) *Prima facie* case

It is undisputed that Dr. Aluru met with Dr. Wohlner in mid-2008 and raised certain concerns and complaints about her employment, however, the content of this meeting is somewhat unclear from the record. In her affidavit Dr. Aluru alleges that she complained of "Gutowski's hostile, abusive, discriminatory, and derogatory treatment of me." Consultants maintains that Dr. Aluru complained only of ordinary work-related grievances at this meeting, and did not specifically contend that Dr. Gutowski or anyone else was discriminating against her because of her age, sex, religion, etc. At her deposition, when asked "what in particular were you complaining about [to Dr. Wohlner]?," Dr. Aluru responded "All of this," apparently referring to unspecified topics the parties had already discussed. When asked "did you tell Dr. Wohlner that Dt. Gutowski was discriminating against you?," Dr. Aluru responded "I told exactly what happened here." Asked "... but did you tell Dr. Wohlner that it was discrimination, or words to that effect?," Dr. Aluru responded "As I told you, I can't recall the conversations, but these are the things I let him know." The Court has some concerns that Dr. Aluru's affidavit – that she "complained of . . . discriminatory treatment" – fundamentally conflicts with her prior

deposition testimony that she "can't recall the conversations," raising "sham affidavit" concerns. *See generally Kitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n. 3 (10th Cir. 2014). Nevertheless, taking the evidence in the light most favorable to Dr. Aluru and drawing all reasonable inferences in her favor, the Court will assume that Dr. Aluru's complaints to Dr. Wohlner included allegations of unlawful discrimination, such that her meeting with him in 2008 constituted protected conduct for purposes of § 1981.

Consultants' motion assumes that the only adverse employment action Dr. Aluru asserts was retaliatory is her termination in 2012. Dr. Aluru does not appear to allege otherwise. The Court limits its consideration of her § 1981 retaliation claim accordingly.

The Court then turns to the "causal connection" element of the *prima facie* case. To make a *prima facie* showing of a causal connection between the protected conduct and the adverse action, the employee must come forward with some evidence that would permit an inference of retaliatory motive by the person taking the adverse action. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005). Most often, employees rely on a close temporal proximity between the protected conduct and adverse action. *Id.* Only fairly close temporal proximity is enough to support a causal inference – a period of more than about three months between protected conduct and adverse action is insufficient, of itself, to support a causal inference. *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).

Here, more than four <u>years</u> passed between Dr. Aluru's 2008 meeting with Dr. Wohlner about alleged discrimination by Dr. Gutowski and Dr. Wohlner's decision in 2012 to terminate Dr. Aluru. Without the benefit of temporal proximity, Dr. Aluru must come forward with some other evidence that Dr. Wohlner's motive was retaliatory. *Id.* She fails to do so. Dr. Aluru asserts that she can produce persuasive – indeed, direct – evidence of a retaliatory motive, but

her examples all involve statements by Dr. Gutowksi, not Dr. Wohlner.[9] Consultants has come forward with evidence that Dr. Wohlner, not Dr. Gutowski, made the decision to terminate Dr. Aluru, and Dr. Aluru has not come forward with any evidence to the contrary.[10] Thus, evidence that Dr. Gutowski harbored some sort of animus towards Dr. Aluru does not suffice to demonstrate any retaliatory motive on Dr. Wohlner's part.

Accordingly, the Court finds that Dr. Aluru has failed to demonstrate a *prima facie* case of retaliation relating to her termination. Consultants is thus entitled to summary judgment on her retaliation claims.[11]

---

[9] The statements attributed to Dr. Gutowski are problematic in their own right. The first – that Dr. Gutowski told Dr. Aluru that "Consultants did not need 'people of her kind'" working there – is not localized to any specific temporal period, making it impossible for the Court to assume that it occurred after Dr. Aluru complained to Dr. Wohlner. (If one assumes that Dr. Aluru's affidavit is organized roughly chronologically, the paragraph discussing the "people of my kind" statement occurs before the paragraph referencing the meeting with Dr. Wohlner.) Moreover, it is not particularly clear that Dr. Gutowski's statement is evidence of a retaliatory motive. The statement does not reference Dr. Aluru having complained of discrimination to Dr. Wohlner, and indeed, in other portions of her brief, Dr. Aluru relies on the same statement as evidence that Dr. Gutowski was referring to her race, sex, religion, or age with the "people of my kind" remark, not referring to her having complained to Dr. Wohlner.

The second statement she references are Dr. Martin's recollections of Dr. Gutowski referring to her as a "bitch" and "Hindu bitch." As noted above, these statements appear to be related to her October 2007 vacation request, and thus, precede her meeting with Dr. Wohlner. In any event, references to Dr. Aluru as a "bitch" or a "Hindu bitch" do not appear to have any intrinsic connection to her having complained of discrimination.

The final statement occurred in July 2012, after Dr. Gutowski had informed her that she had been terminated. She asked why, and he allegedly responded that "the 'culture' of Consultants was changing." Even assuming that this statement is indicative of some nefarious character – an inference that is not necessarily justified – it is not entirely clear that such a statement is in any way tied to the fact that Dr. Aluru complained about discrimination four years earlier.

[10] Dr. Aluru makes two references in her brief to alleged testimony by Dr. Martin that "Gutowski was directly involved in making hiring and termination decisions for Consultants." *Docket #* 70 at 5 (¶ 11), 36. In neither instance does the cited portion of Dr. Martin's deposition support such a contention, at least as it would relate to decisions to terminate physicians.

[11] Even assuming she could establish a *prima facie* case of retaliation, for the reasons explained earlier, Dr. Aluru has failed to demonstrate a genuine issue of fact as to whether

**C. Remaining claims**

The remainder of Dr. Aluru's claims – breach of contract (Claim 12), violations of CADA (Claims 13 and 14), tortious interference (Claims 16 and 17), outrageous conduct (Claim 18), and wrongful discharge (Claim 19) – all arise under state law. Because the Court grants summary judgment to Consultants on all of Dr. Aluru's claims arising under federal law, the Court lacks subject matter jurisdiction over these remaining claims. Although the Court has the discretion to continue to exercise supplemental jurisdiction, it generally does not do so in these circumstances. 28 U.S.C. § 1367(c)(3); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir.2011) ("when all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims"). Accordingly, the Court dismisses Dr. Aluru's state-law claims for lack of subject matter jurisdiction.[12]

---

Consultants' proffered reason for her termination is false, and thus, Consultants would be entitled to summary judgment on her retaliation claims in any event.

[12] Were the Court to reach these claims on their merits, it would nevertheless grant summary judgment to the Defendants on each claim. The breach of contract and wrongful discharge claims are duplicative of the disparate treatment claims. *Peru v. T-Mobile USA, Inc.*, 897 F.SUpp.2d 1078, 1086 (D. Colo. 2012); *Caspar v. Lucent Techs., Inc.*, 280 F.Supp.2d 1246, 1249 (D. Colo. 2003). The CADA-related claims are insufficiently exhausted. The tortious interference and outrageous conduct claims fail because Dr. Aluru cannot show that Dr. Gutowski participated in the decision to terminate her.

## V. CONCLUSION

The Court hereby **GRANTS IN PART** Consultants' Motion for Summary Judgment **(#66)**. The Clerk of the Court shall enter judgment in favor of the Defendants and against Dr. Aluru on Claims 1-11. The remaining claims, Claims 12-19 are **DISMISSED** without prejudice for lack of subject matter jurisdiction. The Clerk shall close this case.

DATED this 31st day of March, 2016.

**BY THE COURT:**

Marcia S. Krieger
United States District Court